UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| LARRY BEST, JR., | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 1:16-cv-02549-TWP-MJD ) |
| INDIANA DEPARTMENT OF CORRECTION, DUSHAN ZATECKY, JOHN SAFFORD, JEFFERY KING, BLAINE HURT, WALTER PETERSON, and HERBERT DUNCAN, | ) ) ) ) ) ) |
| Defendants. | ) |

## ORDER GRANTING DEFENDANTS' HURT AND PETERSON'S MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on a Motion for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56 by Defendants Blaine Hurt ("Hurt") and Walter Peterson ("Peterson") (collectively, "Defendants") (Filing No. 146). Plaintiff Larry Best, Jr. ("Best") initiated this lawsuit against Hurt and Peterson as well as other prison officials and medical staff for violating his Eighth, Ninth, and Fourteenth Amendment rights by failing to protect him and having a deliberate indifference toward his health and safety. Hurt and Peterson assert that the evidence shows they lacked sufficient knowledge of threats to Best's safety to support a constitutional claim for deliberate indifference. For the following reasons, the Court **grants** their Motion.

### I. BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Best as the non-moving party. *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 255 (1986). The factual background is set forth in detail in a previous Order on a motion for summary judgment in this matter (*see* Filing No. 107 at 2–3). The facts below are relevant to the Motion for Summary Judgment currently before the Court.

During the time period relevant to the claims at issue in this action (Filing No. 97-2 at 1) Best was an inmate and both Hurt and Peterson were correctional officers at the Pendleton Correctional Facility ("Pendleton") located in Pendleton, Indiana. In either 2010 or 2012, Best was attacked in "O Dorm" when he was chased by an inmate with a knife, but he evaded the assault. Sometime in 2011, Best was "jumped" in "D Building" by another inmate and sustained minor injuries. He informed Peterson in 2012 or 2013 about being jumped in D Building (Filing No. 147-1 at 19–22).

Best was moved from the general prison population into restrictive housing and held in administrative segregation from December 2011 until July 24, 2015, because of acts of violence and threats of violence against him by fellow prison inmates (Filing No. 95-13 at 8; Filing No. 97-2 at 1). He faced violence and threats of violence because members of the Aryan Brotherhood prison gang tried to recruit him beginning in 2008 or 2009, but he refused to join their gang (Filing No. 147-1 at 11–13). Best told prison officials—Counselor Ballinger ("Ballinger"), correction officers John Safford ("Safford"), and Peterson—that many members of the Aryan Brotherhood prison gang had tried to recruit him into their gang, he refused, and threats were made. *Id.* at 12– 13. Prison officials Herbert Duncan, Safford, and Ballinger knew that Best was subjected to a large number of threats of violence and acts of violence (Filing No. 95-13 at 12–14; Filing No. 95-11 at 6–12). However, no investigation was conducted concerning the continued threats against Best while he was in administrative segregation (Filing No. 149-22 at 3–4; Filing No. 95-13 at 6).

While in administrative segregation, Best's life was threatened many times by a fellow inmate in the presence of Safford and Ballinger (Filing No. 147-1 at 9–11, 14, 64–65). On January 5, 2015, Best was assaulted by an inmate who threw hot liquid with glass shards on him while he was in his cell (Filing No. 97-2 at 1; Filing No. 149-9). During one of his periodic 90-day review meetings, Best told Ballinger that he did not want to be released into the general population because "[he] didn't feel [he] was ready because no investigation had been done as to the threats or who all was doing it or what should be done." (Filing No. 147-1 at 15.) Best was more comfortable being transferred to a different facility than being placed back in the general population. Best shared these same thoughts with Safford. *Id.* at 15–16.

On July 6, 2015, Best had a 90-day review meeting with his case manager Jeffery King ("King"). During this meeting, King informed Best that he was being transferred out of restrictive housing and into the general population. Best did not request to return to general population and instead told King that he wanted to stay in restrictive housing (Filing No. 147-1 at 30–32; Filing No. 149-11). King explained that he would have to talk with Safford about the planned reassignment. Safford approved the reassignment to general population (Filing No. 147-1 at 33; Filing No. 149-3 at 1). Despite the violence and threats of violence against Best, over his objection, Best was moved from restrictive housing into the general prison population on July 24, 2015 (Filing No. 147-1 at 15–16; Filing No. 97-2 at 1).

On August 7, 2015, only two weeks after being moved back to the general prison population, Best was attacked by other inmates. His attackers placed rocks inside socks and then beat Best with them. Best had been at the medical infirmary sometime around 5:30 p.m. for approximately twenty to thirty minutes to pick up a prescription. A prison officer was present in the infirmary, and once the inmates were finished picking up their medications, the officer called

for the inmates to be released from the infirmary. The inmates were released to begin their walk back to the cellhouse. Best's attack occurred while he was leaving the infirmary, which was located in an area that was a "blind spot" for prison officials and was known to be a dangerous area. The area was known for inmate-on-inmate assaults because several attacks had occurred there, including on July 28, 2015. On August 7, 2015, only two weeks after being moved back to the general prison population, Best was attacked by other inmates. His attackers used large rocks (which prison officials had set in front of prison cell houses), placing the rocks inside socks and then beating Best with them. Best sustained severe lacerations and bruises to his head, face, back, shoulders, arms, and right hand and wrist during the attack. He was bleeding profusely and sought medical treatment for his injuries. Immediately after the attack, Best was transferred back to restricted housing. During the weeks and months following the attack, Best suffered constant, severe headaches, dizziness, and blurred vision ([Filing No. 97-2 at 2](), 6; [Filing No. 95-4](); [Filing No. 95-2](); [Filing No. 95-1](); [Filing No. 149-23 at 3](); [Filing No. 147-1 at 50]()–52).

On the day Best was attacked, Hurt, a correctional sergeant, was responsible for monitoring the movement of inmates from the infirmary to the cellhouse. Unfortunately, Hurt was out of position to have a line-of-sight of the inmates as they exited the infirmary. Hurt did not see Best get attacked, and he did not know there was an attack until he was radioed by the officer in the infirmary ([Filing No. 147-2 at 6](), 13–14, 16–22). Best did not see Hurt before the attack. Hurt was not visible to Best when the inmates were released from the infirmary to begin their movement across the yard to the cellhouse ([Filing No. 147-1 at 57](), 60–61). Best never told Hurt that he was being threatened by members of the Aryan Brotherhood, and Hurt did not know that Best was being threatened. Best never told Hurt he was concerned about his safety as to any other inmates, and Hurt never observed anything that caused concern about Best's safety while housed in the

same cellhouse with any other inmate ([Filing No. 147-2 at 9](#)–10, 31). Weeks after the attack, Hurt escorted Best to the infirmary, and they talked about the attack. When Best complained about the lack of help from Hurt, Hurt responded that "he had a lot going on and was busy." ([Filing No. 147-6 at 3](#).)

On September 26, 2016, Best filed this lawsuit, asserting claims against the State of Indiana, the Indiana Department of Correction, prison officials, and medical staff for failing to protect him and having a deliberate indifference toward his health and safety ([Filing No. 1](#)). On March 4, 2019, Best filed his Amended Complaint, asserting claims against the Indiana Department of Correction and the prison officials for failure to protect and deliberate indifference ([Filing No. 158](#)). Defendants Hurt and Peterson filed their Motion for Summary Judgment, arguing that the evidence shows they lacked sufficient knowledge of threats to Best's safety to support a constitutional claim for deliberate indifference and failure to protect.

## II. SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a

summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

## III. DISCUSSION

"[P]rison officials have a duty to protect prisoners from violence at the hands of other prisoners. It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." *Pinkston v. Madry*, 440 F.3d 879, 889 (7th Cir. 2006) (internal citations and punctuation omitted). To establish an Eighth Amendment failure to protect claim, a plaintiff must show (1) that he suffered an objectively "sufficiently serious" injury, and (2) that he was "incarcerated under conditions posing a substantial risk of serious harm" to which the prison official acted with "deliberate indifference." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A prison official may

be liable "only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 847. Eighth Amendment liability cannot attach "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

> To prove deliberate indifference, [a plaintiff] need[s] to show that the defendants knew of a substantial risk of serious injury to him and failed to protect him from that danger. But as the court noted, a general risk of violence in a maximum security unit does not by itself establish knowledge of a substantial risk of harm.

*Shields v. Dart*, 664 F.3d 178, 181 (7th Cir. 2011) (internal citations omitted).

The Supreme Court has "distinguished deliberate indifference . . . from negligence . . . , holding that . . . Eighth Amendment liability requires more than ordinary lack of due care for the prisoner's interests or safety." *Farmer*, 511 U.S. at 835 (internal citations and punctuation omitted). "[C]onduct that simply amounts to mere negligence or inadvertence is insufficient to justify the imposition of liability." *Pinkston*, 440 F.3d at 889 (internal citations and quotation marks omitted).

A.  **Deliberate Indifference Claim Against Hurt**

The Defendants assert that there is no evidence to support a deliberate indifference/failure to protect claim against Hurt, and thus, summary judgment is warranted. They argue the evidence shows Hurt had no actual knowledge of any impending harm to Best. Prior to the attack, Best had never informed Hurt that he was concerned for his own safety or that he had been threatened with violence by members of the Aryan Brotherhood. Best has no evidence to show that Hurt both knew of and disregarded an excessive risk to Best's health or safety. Therefore, they assert, there are no facts to support a constitutional claim of deliberate indifference.

7

The Defendants argue that Best must show Hurt had knowledge of more than a general risk of violence in the prison; he had to know of a specific or particular risk to Best, and the evidence does not support such a knowledge. There is no evidence that Hurt was aware of facts from which he could draw an inference of substantial harm to Best, and there is no evidence that Hurt actually drew that inference. Hurt failed to see the attack when it happened, and "at worst, his actions were *negligent* in failing to see that Best was being assaulted, which is not sufficient to establish deliberate indifference." (Filing No. 147 at 11–12) (emphasis in original).

In response, Best argues that Hurt is liable because he left Best exposed to a substantial risk of serious harm, and Best was in fact assaulted. Best argues,

> Hurt was aware that there was a substantial risk that Best was subject to assault because Best is now in the general prison population after having been released from long term protective custody. Hurt was not just surprised but *shocked* that Best was returned to the general prison population. Hurt *expected* that Mr. Best would be assaulted by an inmate on his return to general population because of the extended residence in restricted housing.

(Filing No. 149 at 11) (emphasis in original). Best asserts that Hurt was the only officer monitoring inmates coming back from the infirmary, he authorized their release from the infirmary, and he could not see the inmates coming from the infirmary to ensure their safety. Best argues that "Peterson and Hurt were aware that Mr. Best had been subject to a 'large number' of inmate assaults prior to the incident that gives rise to the present complaint. [Duncan 97:11-18; 98:21-99:2, Best Dep. 21: 6-21]." (Filing No. 149 at 4.) Because he knew of the substantial risk that Best would be assaulted, Hurt ignored and was deliberately indifferent to that risk when he did not adequately monitor the medical line.

The evidence which Best cites for his assertion of liability indicates that Duncan, Safford, and Ballinger were aware of the assaults. The designated evidence does not support his allegation that Hurt was aware he had been subject to a large number of inmate assaults.

8

Best relies on Hurt's deposition testimony to assert that Hurt was shocked that Best was returned to the general prison population and that Hurt expected Best to be assaulted by an inmate. However, the evidence does not support the assertion that Hurt expected Best to be assaulted. During his deposition, Hurt testified that the assault did not surprise him because he knew that Best "had been on lockup approximately maybe seven, eight years since I've known him. And I know he was [protective custody], so usually -- so protective custody inmates usually don't go back to general population." ([Filing No. 149-19 at 11](Filing No. 149-19 at 11).) This statement does not show that Hurt expected Best to be attacked, as Best asserts.

Best's claim against Hurt centers on his legitimate complaint that Hurt was out of position to have a line-of-sight of the inmates or that he had left the area when he authorized the release of the inmates from the infirmary and when they exited the infirmary. Hurt admitted that he "had a lot going on and was busy" when he authorized the inmates to leave the infirmary and when Best was attacked ([Filing No. 147-6 at 3](Filing No. 147-6 at 3)). Hurt also knew of the general risk of violence at the prison and that protective custody inmates usually do not go back into general population. But the evidence indicates that Hurt did not know of the prior attacks and threats against Best. Best never told Hurt he was concerned about his safety or that he had been threatened. Hurt did not know that Best was being threatened. Hurt never observed anything that caused concern about Best's safety while housed in the same cellhouse with any other inmate. The evidence clearly supports a claim of negligence on the part of Hurt for not maintaining visual contact with the inmates as they left the infirmary, but the evidence fails to support a deliberate indifference claim. Hurt did not have the requisite understanding of the risk of serious harm to Best and then consciously disregard that risk to support Best's constitutional claim.

"Eighth Amendment liability requires more than ordinary lack of due care for the prisoner's interests or safety," *Farmer*, 511 U.S. at 835, and "conduct that simply amounts to mere negligence or inadvertence is insufficient to justify the imposition of liability." *Pinkston*, 440 F.3d at 889. Because the evidence indicates that Hurt was negligent, but not deliberately indifferent, in his duties as the yard monitor when Best was attacked, summary judgment in favor of Hurt is appropriate as to Best's constitutional claim against him.

B.  **Deliberate Indifference Claim Against Peterson**

In his response brief, Best explains the basis for his deliberate indifference claim against Peterson.

> The basis for complaint against Peterson is that from September 2011 to July 2015 this officer was aware of the threats to Mr. Best and did not investigate no[r] do anything to protect Mr. Best. Peterson knew Mr. Best was the subject of a large number of inmate assaults prior to the decision to release him to the general prison population in July 2015. On [sic] December 2013 Peterson moved Mr. Best due to threats and signed for a bed change as Best was put on "hold pending investigation" yet there was never an investigation. Peterson witnessed Deb Sipe brazenly threaten to kill Mr. Best over thirty times in September 2014 even though he and two other corrections officers were present. Peterson took no action to protect Best. Caseworker King states he sent an email to Peterson (and others) asking if anyone had thoughts on whether Best (among others) should remain or stay in administrative restricted house (ARSH). Peterson reviewed Mr. Best['s] case notes when he received the email from King. Upon review [of] the case notes Peterson knew Mr. Best was assaulted on January 5, 2015. Peterson said that an inmate with hot liquid thrown in his cell should be placed in protective custody. Peterson knew Mr. Best was subject to serious threats on his life but took no action to prevent or even voice a concern for Mr. Best's return to general population. Peterson did not respond to King's email even though his opinion was that Mr. Best should not be released to general population.
>
> Peterson failed to investigate any of the numerous threats to Mr. Best over the 3 years he was in restricted housing. Peterson turned a blind eye to the health and safety of Mr. Best. Peterson exposed Mr. Best to danger, leaving him unprotected when he had the ability to act. Instead he ignored the danger to Mr. Best effectively condoning the attack by allowing it to happen. *Langston v. Peters*, 100 F.3d 1235, 1237 (7th Cir.1996).

([Filing No. 149 at 14](#)–15.)

The Defendants argue that the evidence does not support a deliberate indifference claim against Peterson because any knowledge that Peterson had about threats to Best was stale when the attack occurred in August 2015, Peterson was not aware of the threats presented by Best's actual attacker, and Peterson did not authorize Best's transfer back to the general prison population. They assert that Peterson did not know of a specific threat to Best and that Peterson did not disregard a threat and transfer him to general population in July 2015.

The evidence designated by the parties indicates that Best was "jumped" in "D Building" by another inmate and sustained minor injuries in 2011, and he informed Peterson about this incident in 2012 or 2013 ([Filing No. 147-1 at 19](#)–22). Best told prison officials, including Peterson, that many members of the Aryan Brotherhood had tried to recruit him into their gang. Best was moved from the general prison population into restrictive housing in December 2011. While in restrictive housing, on December 19, 2013, Best had a bed reassignment, and the "reason for move" was "HPI – PETERSON," which was authorized by "DICKSON." ([Filing No. 149-3 at 2](#).) Based on these facts, Best argued,

> On December 19, 2013 Peterson moved Mr. Best from one restricted housing unit to another because of threats on his life. Peterson placed Mr. Best on hold pending investigation but never conducted any investigation. Peterson never performed any investigation into the threats to Mr. Best['s] life before agreeing to release him from restricted housing to general population. [Best Affidavit ¶¶ 7,8; Duncan Dep. 64:10-13; Safford Dep 19:123; Peterson Dep. 36:12-37:2].

([Filing No. 149 at 4](#)–5.)

Best's evidence confirms that an investigation into the threats against him was not conducted because the prison officials took Best at his word that he needed protection ([Filing No. 149-22 at 3](#)). However, the evidence cited by Best does not support his assertion that Peterson authorized or agreed to release him back into general population. The only evidence Best designates to support this assertion is his own affidavit (*see* [Filing No. 149-23 at 2](#)), but Best has

not shown that he has the personal knowledge necessary to provide admissible evidence about this fact. Thus, his affidavit cannot support the assertion.

The designated evidence shows that Peterson was involved with a bed reassignment within restrictive housing on December 19, 2013 (Filing No. 149-3 at 2). However, Best seems to attribute responsibility to Peterson for an earlier bed reassignment and release from protective custody on October 3, 2011, but the evidence shows the change on October 3, 2011, came about because of "RICHARDSON" and "COLE." *Id.* at 3. Importantly, the bed reassignment that placed Best back into general population on July 24, 2015, shortly before the attack, was the result of "SAFFORD" and "MCCONN." *Id.* at 1. There is no evidence that Peterson was involved in this reassignment.

While Best was in administrative segregation, his life was threatened many times by a fellow inmate in the presence of Safford and Ballinger (Filing No. 147-1 at 9–11, 14, 64–65). Best asserts that Peterson also witnessed these numerous threats that occurred in September 2014. He relies on his own affidavit for this assertion (*see* Filing No. 149-23 at 1–2). The Defendants raise the "sham affidavit" rule, asserting that the Court should disregard Best's affidavit testimony because it contradicts his earlier deposition testimony about who witnessed the numerous threats in September 2014. *See Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 759 (7th Cir. 2006) ("When a conflict arises between a plaintiff's sworn testimony and a later affidavit or declaration, the affidavit is to be disregarded . . . ."). Best's earlier deposition testimony indicates that Safford and Ballinger witnessed the numerous threats verbalized by a fellow inmate because Safford's and Ballinger's offices were located next to the inmate's cell. Best's deposition testimony does not conclusively establish that Peterson did not witness the threats; therefore, viewing the evidence in the light most favorable to Best as the non-moving party, the Court will consider Best's later

affidavit testimony that Peterson did witness these threats. The Court considers evidence in Best's favor when reaching its conclusion on the deliberate indifference claim against Peterson.

Concerning the email that King sent to prison officials before Best was moved back to general population, Best argued that "Peterson reviewed Mr. Best['s] case notes when he received the email from King. Upon review [of] the case notes Peterson knew Mr. Best was assaulted on January 5, 2015. Peterson said that an inmate with hot liquid thrown in his cell should be placed in protective custody." ([Filing No. 149 at 14](Filing No. 149 at 14).) Best did not designate any evidence to support his assertion that Peterson reviewed Best's case notes at the time that King sent the email. There is no admissible evidence in the record that Peterson was aware of the January 2015 incident when King sent the email and when Best was moved back to general population. During Peterson's deposition taken in May 2017, Best's counsel asked Peterson whether having hot liquid thrown on an inmate would warrant protective custody, and Peterson stated that it would. However, Peterson's after-the-fact opinion about a hypothetical and protective custody does not support Best's assertion and inference (1) that Peterson knew about the January 2015 incident when King sent his email and when Best was transferred back to general population, and (2) that Peterson held the opinion at that time (when King sent the email and when Best was transferred) that Best should be kept in protective custody because of the hot liquid incident.

In 2012 or 2013, Peterson knew about Best getting jumped by an inmate in 2011. Peterson knew Aryan Brotherhood gang members had tried to recruit Best into their gang. On December 19, 2013, Peterson was responsible for Best's bed reassignment with a hold pending an investigation. Peterson was aware of the numerous verbal threats against Best by a fellow inmate in September 2014. Then on June 29, 2015, King sent an email to seven prison officials, including Peterson, asking if any of them had any thoughts about restrictive housing as to fourteen inmates,

13

including Best (Filing No. 149-10). Peterson did not respond to King's email. Then on July 6, 2015, King held a 90-day review meeting with Best and informed him that he was being transferred out of restrictive housing and into the general population (Filing No. 149-11). King completed a report of classification hearing (Filing No. 149-12), and Peterson was not given an opportunity to review the report (Filing No. 147-3 at 19–20). King talked with Safford about the planned reassignment, and Safford approved the reassignment to general population. The evidence indicates that King and Safford, not Peterson, made the decision to transfer Best back to general population (Filing No. 147-1 at 33; Filing No. 149-16 at 7; Filing No. 149-3 at 1).

Peterson knew about threats to Best as late as September 2014. Nine months later King sent an email to seven prison officials asking if any of them had any thoughts about restrictive housing as to fourteen inmates. Peterson's lack of response to King's email was not an authorization or approval to transfer Best to general population. It also was not an agreement to transfer Best or a ratification of the transfer decision. Peterson did not make the decision to transfer Best back to general population, which eventually led to his attack. Peterson's lack of response may rise to the level of negligence, but his actions do not amount to a deliberate indifference to a substantial risk of serious harm to Best. Therefore, the Court **grants** summary judgment in favor of Peterson on Best's deliberate indifference claim.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, the Defendants' Motion for Summary Judgment is **GRANTED** (Filing No. 146). The constitutional claim for deliberate indifference asserted against Defendants Blaine Hurt and Walter Peterson is **dismissed**. With no remaining claims asserted against them, Blaine Hurt and Walter Peterson are terminated as defendants in this matter. Best's claims asserted

14

against Defendants Indiana Department of Correction, Dushan Zatecky, John Safford, Jeffery King, and Herbert Duncan remain pending for trial.

**SO ORDERED.**

Date: 5/29/2019

_____
TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Bessie M. Davis
LAW OFFICE OF BESSIE M. DAVIS, LLC
legal2615@yahoo.com

David C. Dickmeyer
INDIANA ATTORNEY GENERAL'S OFFICE
David.Dickmeyer@atg.in.gov

Benjamin Myron Lane Jones
INDIANA ATTORNEY GENERAL'S OFFICE
benjamin.jones@atg.in.gov

Jonathan Paul Nagy
INDIANA ATTORNEY GENERAL'S OFFICE
jonathan.nagy@atg.in.gov